WILLIAMS' HEIRS )
   v.   )  APPEAL.
BUCHANON )

116

117

118

HAYES & TRIMBLE, for the appellants,

HAYWOOD and WHITESIDE, for the appellees replied,

WHITE, J. The record shows that this was a caveat filed by Buchanon, to prevent the plaintiff from obtaining a grant upon an entry and survey made under the laws of Tennessee, because it is alleged Buchanon has a better title to the same land derived under a grant from the state of North Carolina dated in the year 1794 and surveyed in 1792. The caveat was filed in the county court of Lincoln, and by the consent of the parties, at May session 1812, was transferred to the circuit court of the same county for trial. At June term 1812 of the circuit court, the cause was continued upon a motion to dismiss the caveat, and at December term the motion was overruled. The counsel for the appellants then moved that the venue might be changed to some adjoining county.

121

The court overruled the motion, stating that the matter of the affidavit upon which the motion was founded was sufficient, but that the application came too late. A jury was then sworn to ascertain the material facts not argued by the parties. They returned a verdict, in which many facts were found, amongst which were the following: that Buchanon had a title regularly derived from the state for the land in dispute—that it lies on the first fork of Little River which empties in on the east side, and adjoins Edmundson's 1280 acre tract which lies on the same stream, beginning at the mouth thereof; that Edmundson had no other 1280 acre tract in the country.

A new trial was moved for, but the motion was overruled, and judgment rendered in favor of Buchanon. A bill of exceptions was taken to the opinion of the court overruling the motion, and the cause removed to this court. And now three points are made by the appellants.

1. The circuit court when applied to ought to have dismissed the caveat.

2. The venue ought to have been changed.

3. A new trial ought to have been granted.

(1) Upon the first point we have been referred to the Acts of 1807, Ch. 2, Sec. 47-48, and it is insisted that the Legislature evidently intended that a caveat should be filed in no case where the caveator set out a complete title by a grant to the land. This argument has been answered in a manner entirely satisfactory to the court. The words in the first part of the section are sufficiently comprehensive to include this case, and it would be unjust to exclude it on account of general words in the close of the section; because, every reason which would show that a caveat ought to lie in cases acknowledged to be within the law, apply, with equal force, to this case. Under the laws of North Carolina, formerly in force in

this country, a caveat is expressly authorized in such cases as this; and it is hardly possible that the assembly of Tennessee, in 1807, intended to lessen the number of cases to which this remedy shall be applied.

In Virginia, a caveat is given in all cases where it is alleged the caveator has the better right. Under our statute it is given to every person who alleges he has a better claim; under their statute it is believed caveats have been used by those who supposed they had a better right, they being grantees, as well as by those who were without grants. Why then, in Tennessee, not suffer those who allege they have better claims, in consequence of having grants, to use the remedy likewise? The expression in our statute is as general as that in the Virginia statute, and we ought to extend the remedy to as great a variety of cases. Surely one of the strongest reasons that can be assigned why the government should not grant land to B, is that it had already granted the same land to A.

*(2)* The second point relied upon is, that the venue ought to have been changed. The substance of that section of the Act of 1809, upon which this question depends is, that upon sufficient reasons being assigned, the venue may be changed, if application is made, at, or before the first trial term. The whole question then is, when was the trial term in the circuit court; was it June or December? In caveat causes the defendant is not called in for a personal defense in writing. Hence no issue is made up as in ordinary cases. This cause was commenced in the County Court; it was then ready for trial; by consent the parties transferred it to the circuit court to be there tried. The first term thereafter the papers were returned to the circuit court may be considered the trial term. It has been urged, that this case should be likened

to the cases of appeals, and in these, by the express words of the statute, there must be thirty days between the county and circuit court, otherwise the papers need not be returned until a short period before the 2nd term succeeding the appeal. Several material distinctions exist between the cases—this is done by the consent of both parties; the other where one is unwilling: in this, the original papers is delivered over to the circuit court; in the other, a transcript of the whole record is made out and carried up.

In cases of appeals it is made the duty of the appellant, under a severe penalty, to carry up the record; but in this case it is not made the duty of either party to carry up the papers.

At all events, the Act of 1809 is so worded as to leave it, as it is probable the Legislature intended, as the circuit court have decided; and the opinion of the circuit courts upon this point ought not to be disturbed.

But it has been urged as this is a caveat case, the trial term never arrives until the court make up the issue; which was not, in this case, until December.

This construction would be attended with bad effects, and the legislature, it is believed, never intended it should be given. The first trial term, is the first term at which the cause might be legally tried. In cases where an issue is made up, it is the first term after that at which the issue is so made. In caveat cases, an issue is never made until the cause comes on for final hearing, which may, and frequently is, many terms after that at which the hearing might have legally taken place. This cause might legally have been tried at June term—the inquiry might at that term have been made by the jury; therefore, that was the first trial term in the circuit court.

*(3)* The third point has been pressed with unusual earnestness; and to form an opinion whether a new trial ought to have been granted, we must of necessity look into the whole of the proof upon the merits of this case.

Before doing so, we ought to bring to our minds these considerations, that it is hardly possible a revising court can have as full a view of the case as the circuit court who superintended the trial. We are bound down to the record. Many circumstances often transpire in the course of a trial, deserving much weight, can never be spread upon the record. Where the judge and jury engaged in the trial coincide in opinion, we ought to hesitate; our means and information as to the matter of fact, are a necessity, much more limited—and a judgment ought never to be reversed for a supposed error on this point, unless in a very clear case. No reasonable ground for support ought to be left, else the opinion should never be disturbed.

How then stand the merits of this question; viz., whether Buchanon's grant covers this land?

The grant itself calls for 1800 acres of land, on the east fork of Little River, above Robert Edmundson's 1280 acre track—beginning at a red oak, running and etc. The proof is, that what may with propriety be called the east fork, and what has been notorious as the main east fork since 1783, is ten miles from the place claimed; but it is likewise proved that the grantee in 1783 called this the east fork, and at the same time, Edmundson called it the first fork. But upon this point, as to whether this be the correct water course, there can be, but little doubt. This grant is for land upon the same stream with Edmundson's 1280 acres—his grant identifies the stream by description; as, the "first fork" and this is proved to be the first fork from the mouth of Little River. Ed-

mundson has but one tract of this size; any one looking for the land covered by Buchanon's grant must know it was on the same stream with Edmundson's. It calls to lie above Edmundson—You must then first fix Edmundson—and this is done without difficulty, because it is to begin at the mouth of the fork, and runs certain courses and distances, so that the boundaries cannot be mistaken. Still difficulties exist as to Buchanon's land. It is to lie above; but we are not told how far? If the trees called for could be found, we could go to them, and there fix the beginning; but no old mark of any description is found.

Well, rather than destroy the grant, we will say it shall lie adjoining, or, immediately above. This has been considered correct as to entries thus worded, and, with at least as much propriety, may this construction be applied to all grants where there is nothing to counteract the presumption that the two tracts were intended to adjoin.

But how are we to fix the precise point of beginning? If either of the open corners of Edmundson called for trees of the same description that this does, and the other did not, that should be the corner, upon the presumption that the trees existed at the place, but that time, or some other cause, had removed them; but there is no such call in Edmundson's grant. Well, if the upper line of Edmundson, and the lower line of Buchanon were to be the same length, the one ought to be the entire boundary of the other. Even this will not apply to Buchanon's case; because his lower line is shorter than that which it is to adjoin. Any shift then, rather than let the grant be lost. It is to lie on both sides of the stream. We ought then to begin at that corner of Edmundson which will nearest give the same proportion of land on east side of the stream; and by adopting this principle, and fixing the

beginning according to it, although it will not include all the land claimed by Buchanon, yet it will include more of the appellants than is now claimed, and therefore the verdict ought not to be disturbed.

In no case should a grant be made void for uncertainty if by any reasonable shift or contrivance it can be fixed to a given spot, and its boundaries ascertained. Why disappoint the expectations and wishes of both the grantor and grantee? Nothing but disorder, injustice, and confusion will result from such a course. Let those who still have warrants to satisfy keep clear of the claims of others. If they do not, the court ought to be astute to prevent the distinction of old claims that are honest and have long since been ripened into grants.

In this record it is shown that prior to making the appellants entry, trees, corresponding with those called for in Buchanon's grant, were then lately marked as the beginning, and lines from those trees run and marked; and the grantee was claiming under this grant to those boundaries thus marked. Now, it is difficult to find any fair, legal, or equitable principle, upon which the state could drive the grantee from this land, if it were attempted, unless some other land could be shown which would better correspond with the calls of the grant—and that is not pretended. The grantee has paid for the land; the state has issued a grant; the place claimed correspond with the general calls—and might it not be fairly supposed that the trees called for, once existed, but time had either destroyed the trees, and, with them, the marks; or, that by some means the marks had disappeared, and that those new marks were only a renewal of the old boundary? If, then, this would be the situation of the state, how can the appellants be in a better situation? The entry was made after this new marking; we must suppose

the locator acquainted with the land and its situation; he would see the place correspond with that mentioned in the grant, and might he not well suppose that those new marks were only intended to perpetuate the true boundary as originally made? If so, why not send him some where else with his claim?

In this case, a decision of this point is unnecessary. The point may sometime arise. Let those who are interested look to it; it is for this purpose it is now stated. For, if such a case as Buchanon's could be supported upon principle, it should never be destroyed for want of a precedent.

OVERTON, J. Without going into a minute detail of the case, as has been done by the other members of the court, it is only necessary for me to offer such additional observations as have occurred. With the reasoning adopted, I perfectly concur.

On the third position, in relation to the propriety of granting a new trial, impressions are entertained respecting the proper method of ascertaining boundary in this case, which form the main ground of decision with me.

In fixing the boundaries of Buchanon's grant, the testimony of William Edmundson is important. In the year 1806, long before Williams entry was made, Buchanon requested him to survey and mark his land. Upon going upon the ground he showed him a red oak, marked as a corner, apparently about twelve months before for the south west corner of the 1800 acre tract; from thence he run agreeably to the calls of the grant, and marked the lines and all the other corners at that time. He did not see any other marks except at the red oak where he be-

128

gan. This red oak stands about forty poles due west of Robert Edmundson's south west corner.

The survey as made by William Edmundson adjoins Robert Edmundson's upper or north boundary; but his lower line being shorter than Edmundson's upper one, of course, Buchanon's south east corner, as marked by William Edmundson is on Robert Edmundson's upper line, west of his north east corner. Buchanon's land lies on both sides of the water course called for, though not equally on both sides.

The principle question is, are these boundaries of Buchanon's grant sufficiently established to prevail against the appellants?

The principle of law is universally recognized, that every instrument of writing, which passes an interest, shall have effect, and not be made void for uncertainty, if, by any reasonable means, the intention of the contracting parties can be effectuated. This brings us to consider the question; first, as between the State and the grantee, and, secondly, between the grantee and the third intervening claim of the appellants.

1. The State has its officers, the surveyor to survey and mark out the boundaries of entries. He is a public agent, and the trustee of every man in society 1 Caines 421. He acts independently of the control of the enterer, and the manner in which he shall act is directed or regulated by the legislature. He certifies in his plat that he marked the corners and lines of Buchanon's land; at least, the law required him to do it, and we must presume he did his duty. Before the plaintiff made his entry, new marks for a corner were shown, running from which the courses of the grant, land would be included sufficiently notorious in point of conformity with the call of the grant. The general description, both in the entry and grant, reason-

129

ably agree with the locality of the land included by these new marks. Considering the situation in which this country was placed in relation to the renewal of land marks, we are constrained as reasonable beings, and upon principles of law, to respect these boundaries. Previous to the act of 1806, ch. 1, sec. 21, there was no law in use authorizing the processioning of lands.

The marks or corners were subject to continual and increasing loss by lapse of time, if not otherwise. There was no public law directing the renewal of these marks or lines. It was scarcely to be expected in the nature of things that proprietors would stand by and quietly submit to loss, perplexity, litigation and trouble, from a source which they believed could be removed by employing a surveyor to renew these lines and corners. They did so, and we know it was a common practice previous to the year 1786, when a processioning law passed. The corner made for the 1800 acre tract, was made before the passage of the Act of 1806, or in other words these new marks on the red oak were made before that time. A little before an Indian treaty had opened that country which had been reserved as Indian hunting grounds, and for a long time barred from access by the whites. From 1792, when the survey of Buchanon was made until 1805, the corner originally marked might have fallen down, or the marks destroyed, designedly or accidently. It is a presumption of law that a corner was once made; and knowing the usage and practice of the country, it is a fair presumption in support of right that these new marks were nothing more than a renewal of the old; and at all events as between the State and its grantee this presumption is incontrovertable, unless the State or some person claiming made it can show other old lines or corners, including lands which answer the description

130

in the grant. Aside from these considerations, if the surveyor had failed to do his duty originally, which cannot be presumed; as between the State and the grantee the State would not be permitted to dispute boundaries marked out by the party himself, agreeing with the calls of the grant unless it could show a survey originally made.

The neglect of a surveyor being a public trustee should not injure a third person, as the party 2 Cairn C. E. 48, in the case of *Leckmore* v. *the Earl of Carlisle* 3 P. W. 215 it is said ''the forbearance of the trustees in not doing what it was their office to have done, shall in no sort prejudice the *Cestui que trust;* since at that rate it would be in the power of trustees, either by not doing or by delaying to do their duty to affect the rights of other persons, which can never be maintained. Wherefore the rule in all such cases is, that what ought to have been done shall be taken as done, and a rule so powerful it is, as to alter the very nature of things; to make money land and on the contrary turn land into money. Thus, money articled to be laid out in land, shall be taken as land, and descend to the heir; and on the other hand, land agreed to be sold shall be considered as personal estate.''

As between individuals, they are competent to locate and survey their own lands (3), 7 Johns, 1-12-2-28; 4 H & M 194.

The law delights in the settlement of boundaries (4), Newl 109.

In Pennsylvania, it has been determined that a claimant can have a second survey made, including different land from the first, provided such second survey be made on the land of the state; or, in other words, on which no other person had acquired a title, either legal or equitable. (5), Add. Rep. 251: 2 Bin. 39.

131

The State will not be permitted to dispute the second survey if no person can be injured. So if a survey previously to an entry of the same land, by the person for whose benefit the survey was applied. (6), 1 Bin. 227.

Why then may not marks made after the issuance of a grant (where it is covertly done) be obligatory on the State, as well as in the case where they are made even before the claimant has a warrant or entry?

When we perceive the efforts which have been made by courts in every country to prevent the destruction of contracts by uncertainty, particularly as respects the locality and boundary of land granted, no doubt can be entertained that the state will not be suffered to dispute this red oak corner. (7), Hardin 292, Hughes 147, 3 Cairns 293, 1 Bin. 247; 2 Bin. 39; 5 John 450, 2 Bay 521; 1 Bay 247; 1 Bin. 148; Sit 30; Ten. Rep 463, 529; 3 Bin. 28.

2. How far is the case altered, by the intervention of the interest of a third party subsequently acquired from the same source?

The record shows that the locator of the plaintiff's entry had notice. (8), 3 Bin. 28, 36.

As respect surveys on vague entries this question has never been decided, nor is it intended to give any opinion on it in this case, because it is believed, situated as the plaintiffs are, they stand in no better situation than the state under which they claim. It is sure that the State could not claim the land from Buchanon. At the time Williams' entry was made, there were marked corners and lines; though lately made, they agreed with the calls of Buchanon's grant, which possessed sufficient certainty and the enterer, honestly designing to steer clear of other men's rights which were prior in date, as well as to acquire rights of his own, ought naturally to conclude these,

where the renewed marks of Buchanon's grant, as they accorded with the grant which he had seen.

Therefore, he ought to have held his land, and taken land elsewhere. According to the principles of equity Buchanon surely ought to hold this land. His legal right covers it; and it would be contrary to the numerous decisions found in the books, that the plaintiffs, who have only an equitable claim, should take it from him.